650 F.2d 1389
 107 L.R.R.M. (BNA) 2880
 DIVISION 1235, AMALGAMATED TRANSIT UNION, AFL-CIO, Plaintiff-Appellee,
v.
METROPOLITAN TRANSIT AUTHORITY, ATE Management and Service
Company and Transportation Management of
Tennessee, Inc., Defendants-Appellants.
 No. 79-1511.
 
 Sixth Circuit.
 Argued June 5, 1980.
Decided June 3, 1981.
 Charles H. Warfield, Ellen K. Bronaugh, Farris, Warfield & Kanady, Peter Curry, Metropolitan Dept. of Law, Legal Dept., Nashville, Tenn., for defendants-appellants.
 Cecil D. Branstetter, Branstetter, Moody & Kilgore, Nashville, Tenn., Linda R. Hirschman, Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., for plaintiff-appellee.
 Before MERRITT, KENNEDY and BOYCE F. MARTIN, Jr., Circuit Judges.
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 1
 This case presents substantially the same questions as Local Division 1285 v. Jackson Transit Authority, 650 F.2d 1379, decided today by this court. The legal issue is whether Section 13(c) of the Urban Mass Transportation Act, 49 U.S.C. § 1601 et seq., creates a private federal right of action for employees of local transit authorities which have received federal funds under the Act. We submitted this question to detailed analysis in Jackson and decided that municipal transit employees do in fact enjoy an implied right of action under Section 13(c). We reiterate that conclusion here.
 
 
 2
 From 1956 to 1973, a private bus company provided intracity transportation in Nashville, Tennessee. In 1973, however, the City of Nashville applied for and obtained a federal grant which enabled it to purchase the private company's assets and take over the operation of the mass transit system. At about the same time, the Nashville Metropolitan Transit Authority (MTA) concluded an agreement with ATE Management and Service Co., Inc., whereby ATE agreed to perform certain management functions, including labor contract negotiations, on behalf of the MTA. ATE then formed a subsidiary corporation, Transportation Management of Tennessee, Inc., which became the employer of the transit workers.
 
 
 3
 As a condition of federal funding, Section 13(c) of the Act requires grant recipients to make "arrangements" for the protection of their employees' interests.[1] Accordingly, the MTA entered into a "Section 13(c) agreement" with Local 1235, Amalgamated Transit Union ("the Union"), the collective bargaining agent for the transit employees. For the purposes of this litigation, the critical portion of the original 1973 Section 13(c) agreement is Paragraph 8; the corresponding section of a subsequent agreement, concluded in 1975 in connection with a second grant application, is Paragraph 9. Those paragraphs provide for the submission of labor disputes which remain unresolved after sixty days of collective bargaining to binding interest arbitration.[2]
 
 
 4
 The present dispute arose in May, 1979, upon the expiration of the collective bargaining agreement then in effect. In the course of negotiating a new collective bargaining agreement, the parties reached an impasse on the issue of wages. The employer refused a union request to proceed to arbitration, and the Union filed this suit.
 
 
 5
 The District Court, D.C., 477 F.Supp. 1027, relying on 28 U.S.C. § 1331, assumed jurisdiction over the controversy. After hearing oral argument, it found that Section 13(c) of the Act gives the Union a right to enforce the arbitration provisions of the Section 13(c) agreement in federal court. On August 31, 1979, the District Judge issued an order directing the employer to submit to interest arbitration pursuant to the Section 13(c) agreement. The employer appeals.
 
 
 6
 As we have already observed, this case raises issues which we recently explored at length in Jackson, supra. To the extent that the two cases are identical, we deem it unnecessary to recapitulate here the arguments which led to our inference of a private right of action from Section 13(c). Suffice it to say that the District Judge's resolution of the essential jurisdictional and substantive questions is entirely consistent with our approach in Jackson, and is hereby affirmed.[3] The present case does, however, differ from Jackson in two significant respects, which we address briefly.
 
 
 7
 First, in Jackson, the Union alleged a violation of a right guaranteed by Section 13(c) on its face the right to continued collective bargaining. Here, however, the Union alleges a violation of its right to interest arbitration. Interest arbitration, although provided for in the parties' Section 13(c) agreements, is not specifically mandated by the statute itself. Thus, the present case squarely poses the question of whether the Union can seek relief in a suit predicated on the federal statute, or whether its complaint alleges no more than a state law breach of contract claim.
 
 
 8
 Three other circuits have held analogous claims to be actionable in suits under the statute even though Section 13(c) does not require protection of interest arbitration rights. Local Division 714, Amalgamated Transit Union v. Greater Portland Transit Dist., 589 F.2d 1 (1st Cir. 1978); Amalgamated Transit Union v. LaCrosse Municipal Transit Util., 585 F.2d 1340 (7th Cir. 1978); Division 1287, Amalgamated Transit Union v. Kansas City Area Trans., 582 F.2d 444 (8th Cir. 1978), cert. denied, 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979). We agree, as did the District Court, with that portion of the First Circuit's Greater Portland opinion which holds that noncompliance with the provisions of a Section 13(c) agreement is tantamount to a violation of Section 13(c) itself:
 
 
 9
 Section 13(c)'s implied requirement of compliance is not limited, moreover, to just those arrangements that may be said to be commanded by the substantive provisions articulated in § 13(c). Thus here the absence of an express requirement for interest arbitration is not significant. The statutory emphasis is upon the securing of fair and equitable arrangements to protect the interests of employees, as determined by the Secretary of Labor, which arrangements shall include "without being limited to," certain specified provisions. Once the labor protective arrangements have been made, approved, and incorporated in the grant contract they have become the vehicles for carrying out Congress' purpose. We believe that Congress contemplated that a grant recipient would comply with all the terms and conditions of an approved protective arrangement upon which the grant was conditioned, regardless of whether or not other terms and arrangements would have been equally acceptable under § 13(c). 589 F.2d at 12.
 
 
 10
 Any other conclusion would, we believe, frustrate Congress' purpose in conditioning the receipt of federal funds upon effective protection of employee interests. See Jackson, supra.
 
 
 11
 Second, unlike Jackson, this case required the District Court to interpret certain provisions of the Section 13(c) agreement, including the scope and effect of the interest arbitration sections. On appeal, the employer insists that the interest arbitration provisions come into play only under limited circumstances; it asks us to reverse the District Judge's more expansive reading. After reviewing the record, however, we cannot find that the District Judge's interpretation is inconsistent with either the language of the agreement itself or ordinary canons of contract construction.
 
 
 12
 The judgment of the District Court is affirmed.
 
 
 13
 MERRITT, Circuit Judge, dissenting.
 
 
 14
 I disagree that § 13(c) of the Urban Mass Transportation Act, 49 U.S.C. § 1609(c) (1976), creates a private federal right of action for breach of contract by transit employees against municipal transit authorities receiving federal funds. I have set out the reasons for my disagreement in 650 F.2d 1379, Local Division 1285, Amalgamated Transit Union, AFL/CIO/CLC v. Jackson Transit Authority and the City of Jackson, et al., a companion case.
 
 
 
 [1]
 Section 13(c) reads:
 It shall be a condition of any assistance under section 1602 of this title that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2) of this title. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements.
 
 
 [2]
 Paragraph 8 of the 1973 agreement provides, in pertinent part:
 In case of any labor dispute or controversy regarding the application, interpretation, or enforcement of any of the provisions of this agreement which cannot be settled by collective bargaining within sixty (60) days after the dispute or controversy first arises hereto, such dispute or controversy may be submitted at the written request of the Metropolitan Government (or the operator of the transit system as its designate) or the Union to a board of arbitration as hereinafter provided ... The term "labor dispute," for the purposes of this paragraph, shall be broadly construed and shall include, but not be limited to, any controversy concerning wages, salaries, hours, working conditions, or benefits, including health and welfare, sick leave, insurance, or pension or retirement provisions, any differences or questions that may arise between the parties, including the making or maintaining of collective bargaining agreements, the terms to be included in such agreements, any grievances that may arise, and any controversy arising out of or by virtue of any of the provisions of this agreement for the protection of employees affected by the Project.
 
 
 [3]
 However, we express no opinion on the District Court's discussion of the employees' "right to strike." As the District Judge himself noted, that question is not essential to the resolution of this case