**DIVISION 587, AMALGAMATED TRANSIT UNION, AFL–CIO, Plaintiff-Respondent,**

v.

**MUNICIPALITY OF METROPOLITAN SEATTLE, Defendant-Petitioner.**

No. 80–3532.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 4, 1981.

Decided Nov. 24, 1981.

Rehearing Denied Feb. 12, 1982.

J. Markham Marshall, Preston, Thorgrimson, Ellis & Holman, Seattle, Wash., for defendant-petitioner.

Linda R. Hirshman, Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., for plaintiff-respondent.

Before WRIGHT, SCHROEDER and ALARCON, Circuit Judges.

SCHROEDER, Circuit Judge:

The Municipality of Metropolitan Seattle ("Metro") appeals from a preliminary injunction ordering it to submit to interest arbitration of a new collective bargaining

agreement pursuant to the terms of a contract required by § 13(c) of the Urban Mass Transportation Act of 1964, 49 U.S.C. §§ 1601 *et seq.*. Four other circuits have considered union applications to enforce parallel provisions of similar contracts; in all instances the union's position was sustained. *Local Division 1285, Amalgamated Transit Union, AFL–CIO v. Jackson Transit Auth.*, 650 F.2d 1379 (6th Cir.) cert. granted, —— U.S. ——, 102 S.Ct. 1271, 71 L.Ed.2d 457 (1981); *Division 1235, Amalgamated Transit Union, AFL–CIO v. Metropolitan Transit Auth.*, 650 F.2d 1389 (6th Cir. 1981); *Local Division 714, Amalgamatèd Transit Union, AFL–CIO v. Greater Portland Transit Dist.*, 589 F.2d 1 (1st Cir. 1978); *Local Division 519, Amalgamated Transit Union, AFL–CIO v. LaCrosse Municipal Transit Util.*, 585 F.2d 1340 (7th Cir. 1978); *Division 1287, Amalgamated Transit Union, AFL–CIO v. Kansas City Area Transp. Auth.*, 582 F.2d 444 (8th Cir. 1978). We do not depart from that pattern. Nor do we find that the district court abused its discretion in entering the injunction. We affirm.

Section 13(c) of the Act, 49 U.S.C. § 1609(c),[1] requires recipients of federal transit funds to make fair and equitable arrangements to protect the interests of their employees affected by such assistance. These arrangements take the form of agreements between the grant recipient and the union; the agreements must be approved by the United States Secretary of Labor as a condition of the receipt of federal funds. Metro and the appellee union have entered into a series of such § 13(c) agreements since 1972.

Paragraph 15(a) of the 1980 § 13(c) agreement requires that the terms of a new collective bargaining agreement be submitted to binding arbitration ("interest arbitration") if a dispute has been unresolved for over thirty days.[2] The principal issues before us pertain not to the interpretation of that provision but to its enforceability.

The threshold issue in this case, as in the other federal cases involving § 13(c) agreements, is that of federal subject matter jurisdiction. The union argues that this is a case which "arises under" federal law within the meaning of 28 U.S.C. § 1331. Commentators on the issue of the proper scope of federal question jurisdiction seem agreed on only one proposition: no completely satisfactory analytical framework has yet been devised. See the discussion in 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3562 (1975). In this circuit, at least, the favored formulation appears still to be that the case must arise "directly" under federal law, a standard drawn from Justice Cardozo's famous "compass," in *Gully v. First Nat'l Bank*, 299 U.S. 109, 57 S.Ct.

---

1. Section 13(c) reads in full:
    (c) It shall be a condition of any assistance under section 1602 of this title that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting· individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of this title. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements.

2. Paragraph 15(a) provides in relevant part:
    In the case of any labor dispute involving the application, interpretation or enforcement of any of the provisions of this agreement ... which cannot be settled by the parties within thirty (30) days, the same may be submitted at the written request of either party to a board of arbitration .... The term "labor dispute" shall be broadly construed and shall include any controversy concerning ... the making or maintaining of collective bargaining agreements, [and] the terms to be included in such agreements ....

96, 81 L.Ed. 70 (1936). *See, e. g., Town of Greenhorn v. Baker County*, 596 F.2d 349, 351 & n.8, 353 (9th Cir. 1979); *Keaukaha-Panaewa Community Ass'n v. Hawaiian Homes Comm'n*, 588 F.2d 1216, 1225–26 (9th Cir. 1978); *League to Save Lake Tahoe v. B.J.K. Corp.*, 547 F.2d 1072, 1074 (9th Cir. 1976). However, the likelihood of the invocation of this test has proved more certain than the result of its application. *See, e. g.,* Cohen, *The Broken Compass: The Requirement That a Case Arise "Directly" Under Federal Law*, 115 U.Pa.L.Rev. 890 (1967).

Metro's position is that this is simply a contract dispute which should be settled in state court. It stresses that a suit on an agreement between private parties does not raise a federal question merely because the agreement was authorized by federal law or because some federal agency approved the agreement. *See McFaddin Express, Inc. v. Adley Corp.*, 346 F.2d 424 (2d Cir. 1965); *Chicago & Northwestern Ry. v. Toledo, Peoria & W. R.R.*, 324 F.2d 936 (7th Cir. 1963). It also points out that the statute itself does not require that the agreements contain provisions for interest arbitration and it therefore urges that the matter cannot be said to "arise under" the laws of the United States within the meaning of § 1331.

■ Careful review of the authorities persuades us that much more is involved here than simple congressional authorization to contract coupled with governmental approval of contractual provisions. Congress in § 13(c) did not merely authorize agreements to preserve collective bargaining rights of employees. It required them. Congress further required that the Secretary of Labor determine what terms must be included, and Congress specified that the agreements would become part of the grant contract between the United States and the transit authority. In addition, it authorized the Secretary to enforce those contracts. 49 U.S.C. §§ 1602(f), (g); 1608(a); 12 U.S.C. § 1749a. The most extensive discussion of these matters is contained in *Greater Port-*

*land, supra*, 589 F.2d at 5–8, in which the court concluded that violation of a § 13(c) agreement would amount to a violation of federal law. We agree with the First Circuit's statement that, by requiring labor agreements under § 13(c), "Congress implicitly mandated both compliance with those arrangements and a federal remedy for their breach." *Id.* at 7.

With respect to enforcement by private suit, it seems apparent that Congress, in requiring a contractual agreement as the vehicle for the protection of existing labor standards, intended these rights to be enforceable through private actions. Metro does not contend otherwise, nor does it suggest that the four-part test set forth in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), is not met. Moreover, the legislative history of the statute confirms that it was intended to prevent employees from losing any rights that they may have enjoyed previously, including rights conferred by the National Labor Relations Act and enforceable in the federal courts. *Jackson Transit, supra*, 650 F.2d at 1385. *See generally International Association of Machinists v. Central Airlines*, 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963). Again, we see no compelling reason to depart from the unanimous line of authority from other circuits that have considered this question.[3]

Apart from jurisdiction, the main argument presented by Metro is that the parties have agreed to be governed by state law and that state law does not permit Metro to agree to engage in interest arbitration.

■ Metro's contention that the parties have agreed to be governed by state law is based upon the wording of the severance provision of the § 13(c) agreement. The provision is designed to provide for continuity should any part of the agreement be declared invalid, and it states:

In the event any provision of this agreement is held to be invalid, or otherwise unenforceable under the federal, State, or

---

**3.** This issue is not entirely free from doubt and has caused one judge to dissent. *See Local Division 1285, Amalgamated Transit Union*

*1285, AFL–CIO v. Jackson Transit Authority*, 650 F.2d 1379, 1388–89 (6th Cir. 1981) (Merritt, J., dissenting).

local law, in the context of a particular Project, the remaining provisions of this agreement shall not be affected and the invalid or unenforceable provision shall be renegotiated by Metro and the interested union representatives of the employees involved for purpose of adequate replacement under § 13(c) of the Act. If such negotiation shall not result in mutually satisfactory agreement, any party may invoke the jurisdiction of the Secretary of Labor to determine substitute fair and equitable employee protective arrangements for application only to the particular Project, which shall be incorporated in this agreement only as applied to that Project, and any other appropriate action, remedy, or relief.

This contingency provision is not a statement that the parties have agreed to be governed by state law in the event of a conflict between the provisions of the agreement and state law.

██ Nor do we agree with Metro that the arbitration provisions of the § 13(c) agreement conflict with Washington state law concerning powers of municipal corporations in the area of collective bargaining. Metro's argument is premised upon R.C.W. § 35.58.350, a general statute vesting the powers of a municipal corporation with respect to salaries, wages, and other compensation in the metropolitan council.[4] Metro concedes that these powers of municipal corporations are for the legislature to determine, *see Spokane v. Spokane Police Guild*, 87 Wash.2d 457, 553 P.2d 1316, 1320 (S.Ct. 1976), and that the legislature has greatly expanded the scope of collective bargaining and arbitration for public employees. It argues, however, that because there is no specific statute expressly permitting it to

engage in interest arbitration as provided for in this § 13(c) agreement, Washington law prohibits enforcement of those provisions. While it is true that the legislature has not dealt specifically with every aspect of the Urban Mass Transportation Act, it has acted to harmonize Washington law generally with any requirement that Metro might have to meet to obtain funding under the Act. More specifically, the Washington legislature has provided that "[a]ny ... metropolitan municipal corporation ... shall have all powers necessary to comply with any criteria, standards, and regulations which may be adopted under the [UMTA] ... and to take all actions necessary to meet the requirements of that act." [5]

Thus we need not reach the question recently decided by the First Circuit regarding the enforceability of interest arbitration provisions in the face of newly enacted state law expressly limiting arbitration of wages in the transportation industry. *Local Division 589, Amalgamated Transit Union, AFL–CIO v. Massachusetts*, Slip op. Nos. 81–1180, 81–1198, 81–1219, September 30, 1981, as modified on denial of rehearing en banc, October 23, 1981. In that case the Massachusetts legislature had earlier passed general enabling legislation quite similar to Washington's. Later, however, it enacted statutes specifying the scope of and procedures for arbitration involving the MBTA which conflicted with existing arbitration provisions of the § 13(c) agreement between the MBTA and the union. Acknowledging that other circuits have stated that the § 13(c) obligations are binding regardless of state law, *id.* at 39–40 & n.47, the First Circuit nevertheless con-

---

4. Section 35.58.350 states that

   [a]ll the powers and functions of a metropolitan municipal corporation shall be vested in the metropolitan council unless expressly vested in specific officers, boards, or commissions by this chapter. Without limitation of the foregoing authority, or of other powers given it by this chapter, the metropolitan council shall have the following powers:

   . . .

   (3) To fix the salaries, wages and other compensation of all officers and employees of the metropolitan municipal corporation unless the same shall be otherwise fixed in this chapter.

5. Added by Laws, 1st Ex.Sess.1975 ch. 270 § 8, effective July 1, 1975. See also R.C.W. § 35.-58.180, empowering metropolitan municipal corporations to enter into contracts with the United States on such terms as may be agreed upon by the contracting parties.

cluded on the basis of an exhaustive review of the legislative history of the UMTA that "the specific detailed assurances given by a union and a transit authority to the Labor Department under (UMTA) § 13(c) do not invalidate a state law to the contrary." *Id.* at 40.

That is not our case. While we agree that the preemption question is a difficult one, we need not and do not address it in light of Metro's failure to establish that the threshold element, a conflict between state law and the § 13(c) agreement, is presented. The statutes we have referred to, R.C.W. 35.58.2794 and 35.58.180, confer on Metro a broad authority to take those steps necessary to qualify for federal financial assistance; having done so, Metro cannot now argue that it was barred from taking those necessary steps by a prior and more general statute.

■ Metro also contends that the entire § 13(c) agreement, including the provisions regarding collective bargaining and interest arbitration, applies only to those employees shown by the union to have been directly and adversely affected by the expenditure of federal funds. The overall purpose of § 13(c) of the Act was to protect the rights of transit employees, and the § 13(c) agreement between these parties contains a number of provisions relating to individual grievances arising out of a federally funded project. There is no suggestion in this record, however, that there have been different collective bargaining agreements for employees directly affected by a federally funded project as opposed to those who are not. The language in the § 13(c) agreement upon which Metro relies is found in paragraph 15(b), requiring that in "any dispute as to whether or not a particular employee was affected by the Project," the employee must identify both the "Project" and the facts relied upon. We fail to see the relevance of that provision to collective bargaining negotiations. Indeed, paragraph 15(b) would seem to be inapplicable by its terms, as there has never been any dispute in this action "as to whether or not a particular employee was affected by the Project."

The only plausible construction of paragraph 15(b) is that it relates to grievances of individual employees; it cannot be construed as a limitation on the collective bargaining provisions contained in paragraph 15(a).

■ We cannot quarrel with the district court's analysis of the balance of hardships involved in the issuance of an injunction requiring arbitration in order to avoid delay. *See LaCrosse, supra,* 585 F.2d at 1350–51.

Affirmed.